# In the United States Bankruptcy Court
## for the
## Southern District of Georgia
### Augusta Division

FILED at 9 O'clock & 33 min A M
Date 9/6/06

United States Bankruptcy Court
Savannah, Georgia

In the matter of: )
)                    Chapter 11 Case
)
COMMERCIAL & MILITARY )
SYSTEMS COMPANY, INC. )               Number 04-13301
)
*Debtor* )

## MEMORANDUM AND ORDER ON UNITED STATES TRUSTEE'S AMENDED MOTION TO CONVERT TO CHAPTER 7, OR IN THE ALTERNATIVE TO DISMISS THE CHAPTER 11 CASE

The Debtor's case was filed on September 14, 2004. On September 6, 2005, a Motion to Dismiss or Convert by the United States Trustee was heard by the Court, which ultimately entered an order denying that Motion in December 2005. *See* Dckt. No. 86 (December 5, 2005). The United States Trustee has filed another Motion to Dismiss or Convert, which is the matter now before this Court. *See* Dckt. No. 144 (August 9, 2006). The Trustee's actions triggered motions to join in and adopt the Trustee's Motion by three creditors in the case, Sudimat, C.A. ("Sudimat"), Southeastern Equipment Company, Inc., and John S. Smith. *See* Dckt. No. 147 (August 17, 2006); Dckt. No. 150 (August 18, 2006); and Dckt. No. 151 (August 18, 2006). A hearing on this matter was held on August 30, 2006.

## FINDINGS OF FACT

The Debtor (hereinafter "CMS") has been in business for a number of years.

AO 72A
(Rev. 8/82)

It is owned by Jonie and Chin Yu. At least in recent years, its principal source of income has been derived from contracts it entered into with Global Engineering ("Global"), a company affiliated with the Israeli government that is in the business of remanufacturing and refurbishing military vehicles for that government.

In April 2004, Sudimat, which previously had obtained a $1.2 million judgment against CMS, succeeded in defending all appeals of that judgment, making that obligation final. On June 8, 2004, Y&JE, Inc. (hereinafter "Y&JE") was formed. Y&JE does not now and never has had any employees or own any equipment. Jonie and Chin Yu also own Y&JE, and along with their son Eric Yu, they are the principals of Y&JE. Y&JE's only asset is a new contract that it entered into with Global on June 22, 2004, to supply 299 remanufactured military vehicles to Global for the use of the Israeli government. Therefore, both the formation of Y&JE and the execution of its contract with Global occurred shortly after the Sudimat judgment against CMS became final and unappealable.

CMS's owners, Mr. and Mrs. Yu, have testified that their decision to incorporate Y&JE came about at the suggestion of Global, which feared doing business with a company that was engaged in a substantial amount of litigation at the time. The Court has heard no evidence that either corroborates or negates that testimony, and therefore, it accepts it as true for the purposes of this Motion. Since it has no employees, plant or equipment, Y&JE agreed to sub-contract the entire job with Global to CMS, but at a figure substantially lower than the total amount Global would pay Y&JE. The difference between what Global

is to pay Y&JE for its services and what Y&JE will pay CMS is approximately $800,000.00 and amounts to approximately $2,800.00 per vehicle. It is not clear what services Y&JE performs that justifies its receipt of some $800,000.00 in consideration over the life of the contract. As a transaction entered into within 90 days of CMS initiating its Chapter 11 case, it is subject to close scrutiny. Because it is between companies both owned by Jonie and Chin Yu, arguably the transaction might be viewed as a contract that benefits insiders of CMS at the expense of CMS's estate. Therefore, that transaction may be voidable under 11 U.S.C. § 547,[1] or it may be characterized as a fraudulent conveyance under Section 548 as a transaction entered into for less than reasonably equivalent value at a time when CMS was insolvent. The total value of Global's contract with Y&JE was approximately $7.4 million, of which only $6.6 million will be paid to CMS, which is performing all, or essentially all, of the services. When questioned about the services Y&JE provides in exchange for the compensation it receives from its contract with Global and subcontracting the work to CMS, the only explanation was that Y&JE provides financing and assists with the cash advances. I find this explanation unsatisfactory.

At the September 6, 2005, hearing on the initial Motion to Dismiss or Convert, CMS expressed its intention to file a disclosure statement and plan of reorganization by October 31, 2005. *See* Dckt. No. 81, Tr. p. 6, 163, 169, 177-78 (September 6, 2005). At the conclusion of that hearing, this Court was clear, in making its "tentative" ruling, that it

---

[1] Hereinafter, all Section references are to Title 11 of the United States Code.

took that commitment seriously. CMS never met its goal, then or now. It only filed a partial disclosure statement nine months later on July 31, 2006. *See* Dckt. No. 142 (July 31, 2006). CMS has never filed a complete, comprehensive disclosure statement or a plan of reorganization. Furthermore, because the disclosure statement filed by CMS was not in final form, no hearing has been scheduled to consider its adequacy under Section 1125.

## CONCLUSIONS OF LAW

At the August 30, 2006 hearing, Sudimat's counsel was present and actively participated and was authorized to inform the Court that Smith continued to support the position of the United States Trustee for conversion. Two other creditors appeared in support of CMS's request that the Motion to Convert or Dismiss be denied, at least on an interim basis until CMS can file a final disclosure statement and proposed plan. The United States Trustee and co-movants rely on the provisions of Section 1112(b),[2] which provides that the Court, after notice and a hearing, may convert a case to Chapter 7 or may dismiss, whichever is in the best interest of creditors and the estate, for cause including:

(1)　continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;

(3)　unreasonable delay by the debtor that is prejudicial to creditors;

(4)　failure to propose a plan under Section 1121 of this

---

[2] Because this case was filed before October 17, 2005, the provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 do not apply in this matter.

title within any time fixed by the court;

It is important to note that the Court's decision is based on whether there is "cause" for dismissal or conversion and that the list of factors is clearly a non-exclusive one. See In re Wells, 227 B.R. 553, 560 (Bankr. M.D. Fla. 1998). Based on the stipulations of the parties, the documents introduced at the August 30, 2006 hearing, the testimony of witnesses, and the argument of counsel, together with applicable authorities, I conclude that the Trustee's Motion should be granted and that this Chapter 11 case should be converted to a case under Chapter 7. I reach this conclusion for the following reasons:

Unreasonable Delay

As previously noted, the case has been pending for nearly two years. Under the provisions of Section 546(a), a statute of limitations of two years is imposed preventing the prosecution of any estate causes of action for preferential payments and certain types of fraudulent conveyances. As outlined earlier in this opinion, the transaction whereby CMS and Y&JE contracted to deliver remanufacturered military vehicles to Global for use by the State of Israel was structured in such a way that Y&JE has a potential of earning approximately $800,000.00 in income when it is nothing more than a shell corporation established by the principals of CMS, who believed that they would be unable to do business under CMS's name due to the pending litigation that it faced. They formed the company almost immediately after a $1.2 million judgment against CMS became final. The transaction is subject to special scrutiny because it is between two corporations that are

wholly owned and operated by the same individuals. Therefore, the transaction between Y&JE and CMS was clearly a transaction involving insiders. *See* 11 U.S.C. § 101(31)(defining "insider" to include "affiliate" under Section 101(2), which is an entity that directly or indirectly owns or controls a debtor).

CMS's explanation for the formation of Y&JE and the structure of its contract with Global is plausible and may be factually accurate. This Court has previously ruled, however, that it is doubtful whether debtors who have a conflict of interest similar to this can really be expected to investigate potential estate causes of action when they themselves or their principals or insiders are or potentially could be the targets of those estate causes of action. *See* In re Fiesta Homes of Georgia, Inc., 125 B.R. 321, 325 (Bankr. S.D. Ga. 1990)("In short, the obligation to maximize recovery for the benefit of unsecured creditors by the pursuit of these preferences against close family members, who may well feel morally entitled to the money, flies in the face of human nature and that fact alone is enough to show that impartiality and aggressiveness of the Debtor's officers may be called into doubt at a later time."). Had CMS timely filed and obtained approval of a disclosure statement that revealed all relevant facts about the company and provided creditors with the opportunity thereafter to conduct whatever investigation and inquiry they deemed appropriate, CMS might not be in the situation it currently is. However, with the statute of limitation on these potentially valuable causes of action expiring in less than two weeks, the Court, while not finding that any misconduct occurred and expressly reserving judgment on that issue until a later time if necessary, cannot ignore the possibility that a substantial estate cause of action

will be lost if the matter is not placed in the hands of an independent trustee. The loss of this cause of action would be prejudicial to creditors. However, even if no cause of action is ultimately asserted, this extreme delay, impairing the ability to investigate in regular fashion, standing alone, constitutes cause under Section 1112(b) despite the fact that it is not separately listed as an example of what might constitute "cause."

<u>Continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation</u>

Produced at the August 30, 2006 hearing, Sudimat Exhibit 8 is a summary of the monthly reports filed by CMS with the United States Trustee documenting CMS's operations since the filing of its Chapter 11 case through July 2006. In round numbers, it reveals that CMS had total receipts of approximately $7.4 million. Of that amount, slightly over $2 million is characterized as loans and approximately $1.9 million is characterized as contract advances. As a result, I conclude that CMS has received from operations during the past two years slightly under $3.5 million. At the same time, it has incurred expenses of over $7.6 million. Thus, CMS has operated at a substantial loss through the entire period that its Chapter 11 case has been pending.

CMS countered this evidence by producing projections showing that over the next five years, it has the potential of producing net earnings somewhere between $500,000.00 and $900,000.00 per year after payment of all current operating expenses. CMS claims that it would have that amount of net income with which to service its pre-petition

debt under a feasible Chapter 11 plan. Unfortunately, CMS made similar optimistic projections one year ago when it believed that it could produce an average of twenty units of the remanufactured vehicles under its contract with Global for which it would be paid approximately $22,000.00 per vehicle by Y&JE or approximately $440,000.00 per month. *See* Dckt. No. 81, Tr. p. 34, 122 (September 6, 2005).

A review of CMS's receipts showed that since September 2005, it has taken in $4.1 million, but after deducting loans and contract advances of nearly $2 million, its net is only slightly above $2.1 million, and its expenses have topped $4.1 million. *See* Dckt. No. 81, Sudimat Ex. 8 (September 6, 2005). In short, CMS is hemorrhaging money. Although CMS's projections a year ago of twenty vehicles per month were made in what the Court believes to be the utmost good faith, CMS has only been able to produce approximately five units per month. With this background as well as the understanding that CMS believes that market conditions have now improved, it is difficult, if not impossible, for this Court to ignore CMS's dismal failure to live up to its projections in the past and simply allow the loss of millions of dollars to continue.

It is clear that there has been a continuing loss and diminution of the estate, and there is no end in sight. Therefore, there is an absence of any reasonable likelihood of rehabilitation for CMS in Chapter 11. This case is nearly two years old, CMS has not filed a complete disclosure statement that demonstrates some likelihood of producing a feasible plan, and CMS has failed to produce persuasive evidence to counter these facts or indicate

AO 72A
(Rev. 8/82)

8

that any change for the better is in the future.

Other Cause - Discrepancies in CMS's Records

In short, CMS's records are a mess. A brief summary of the evidence should suffice to illustrate that CMS's records are simply internally inconsistent, and thus unreliable in ways that reveal an inability or unwillingness to document the company's financial affairs in a manner consistent with the duties of a debtor-in-possession in Chapter 11. In re Chapel Gate Apartments, Ltd., 64 B.R. 569, 576 (Bankr. N.D. Tex. 1986)("Under [Section 1107], a debtor is either a debtor-in-possession, and therefore occupies a strictly fiduciary role, or it is not, in which case a trustee administers the estate for the benefit of the creditors.").

For example, CMS reported nearly $2 million in loans and $2 million as contract advances on Sudimat Exhibit 8. Unfortunately, upon the cross-examination of CMS's principals, it was determined that certain of what CMS had characterized as contract advances should have been, in fact, properly categorized as loans. For example, a $30,000.00 payment on July 13, 2006, that was shown on the Monthly Operating Reports provided to the United States Trustee as a contract advance (*See* Sudimat Exhibit 5) was, upon examination of the underlying documents, actually treated by the parties as a loan transaction. (*See* Sudimat Exhibit 11). Similar discrepancies occurred on January 4, 2006 (*compare* Sudimat Exhibit 5 *with* Sudimat Exhibit 17 concerning a $90,000.00 payment), June 9, 2006 (*compare* Sudimat Exhibit 5 *with* Sudimat Exhibit 12 concerning a $100,000.00 payment), and July 7, 2006 (*compare* Sudimat Exhibit 5 *with* Sudimat Exhibit 13 concerning

AO 72A
(Rev. 8/82)

9

a $60,000.00 payment). From the evidence before the Court, it is impossible to conclude whether there is anything seriously awry or improper about the way in which money has moved around in this case between affiliates. What is crystal clear, however, is that the accuracy and reliability of CMS's records cannot be accepted at face value. In a bankruptcy system that imposes upon CMS a fiduciary obligation as debtor-in-possession, this situation alone is sufficient to call for the intervention of a Chapter 7 Trustee.

In addition, the sources of other payments were inconsistently recorded in CMS's books and records, and the discrepancies are both numerous and substantial. For example:

1. A February 11, 2005, $30,000.00 loan from Jonie Yu (Sudimat Exhibit 3) is shown elsewhere to be from Y&JE (Sudimat Exhibit 7).

2. A July 7, 2005 payment of $50,000.00 from Chin Yu and another $50,000.00 from Jonie Yu (Sudimat Exhibit 7) are shown elsewhere to be loans from Y&JE (Sudimat Exhibit 4).

3. A July 15, 2005 payment of $100,000.00 from Mr. and Mrs. Yu (Sudimat Exhibit 7) is shown elsewhere as an advance from Y&JE (Sudimat Exhibit 4).

This situation is neither new nor isolated. At the September 6, 2005, hearing, CMS was put on notice of the Court's misgivings with regards to the accuracy of CMS's bookkeeping and accounting, and the urgency of correcting them. *See* Dckt. No. 81,

Tr. p. 170-78 (September 6, 2005). At that time, it appeared that CMS had lost a million dollars or more. However, there was testimony that substantial receivables were due and that there was work in progress of a sufficient value that CMS might actually be breaking even. Because of this, I was unable to find by a preponderance of the evidence that there had been any substantial losses (Tr. 175-77), but the records were of questionable value. They are even less reliable a year later. Chapter 11 debtors cannot operate with such disarray and chaos in their records, regardless of whether they are sloppy or operate with malicious intentions. The United States Trustee, creditors, and this Court must be able to understand a debtor's financial records without the services of a forensic accountant.

## CONCLUSION

The conclusion I reach is most unfortunate for CMS and for its principals, Mr. and Mrs. Yu, but it is one that is inescapable. Even assuming that the Yus have devoted their best efforts to turning this business around and making it successful, and at this point I have no evidence to the contrary, and even assuming that there have been no improper transactions during the pendency of the case, which I have insufficient evidence to assess one way or the other, it is clear that the time has simply come to call an end to an effort that in retrospect was probably doomed from the start. It is a result, however, which CMS has been given more than ample time to attempt to avoid.

## **O R D E R**

IT IS THEREFORE ORDERED that the United State Trustee's Motion is

GRANTED. This case is to be converted to a case under Chapter 7 and referred to the United States Trustee for appointment of a case trustee and further proceedings under that chapter.

*[signature]*
Lamar W. Davis, Jr.
United States Bankruptcy Judge

Dated at Savannah, Georgia

This 5th day of September, 2006.